[Cite as *State v. Moore*, 2019-Ohio-3705.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                        Court of Appeals No. WD-18-030

    Appellee                                     Trial Court No. 2016CR0553

v.

Carolyn Rose Moore                          **DECISION AND JUDGMENT**

    Appellant                                    Decided:  September 13, 2019

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Carolyn Rose Moore, appeals the March 14, 2018 judgment

entered in the Wood County Court of Common Pleas, after she was found guilty of six

offenses and sentenced to five years in prison.  For the reasons that follow, we affirm the

judgment of the trial court, in part, and reverse, in part.

{¶ 2} Appellant sets forth eight assignments of error:

First Assignment of Error: The Trial Court erred when it denied Moore's Motion to Suppress evidence obtained from her blood which was seized pursuant to a search warrant that lacked any indicia of probable cause and from which the affiant omitted material facts.

Second Assignment of Error: Ms. Moore was denied due process of law and a fair trial under the Ohio and United States Constitutions when the State failed to present sufficient evidence, or any evidence at all, that any culpable act or mental state of Carolyn Moore was the proximate cause of the accident, an element of all [of] the homicide charges against her.

Third Assignment of Error: The Trial Court erred when it failed to dismiss Count [Four] by operation of law after it dismissed the predicate charge of possession of drugs.

Fourth Assignment of Error: The Trial Court erred when it denied Ms. Moore's Motion to Suppress the results of the testing done on her blood because the State failed to prove substantial compliance with required Ohio Department of Health regulations.

Fifth Assignment of Error: Ms. Moore was denied due process of law and a fair trial under the Ohio and United States Constitutions when the State failed to present sufficient evidence of a violation of R.C. 4511.19.

Sixth Assignment of Error: Ms. Moore was denied her rights to due process of law and a trial before a fair and impartial jury under the Ohio

and United States Constitutions when the State engaged in prejudicial behavior of such severity that it cumulatively and specifically resulted in Plain Error by the Trial Judge in not declaring an immediate mistrial.

Seventh Assignment of Error: The cumulative effective of errors by the Trial Court, prejudicial evidence admitted over objection, and ongoing animosity between the Trial Judge and defense counsel denied Ms. Moore due process of law and a fair trial under the Ohio and United States Constitutions[.]

Eighth Assignment of Error: Ms. Moore's conviction on all charges was against the manifest weight of the evidence[.]

**Background**

{¶ 3} On the evening of August 3, 2016, appellant was driving a vehicle, owned by her mother, with her boyfriend, John Etzinger, as a front-seat passenger, when they were involved in a single vehicle accident in Bowling Green, Wood County, Ohio. A woman who lived near the scene of the accident called 911. A police officer arrived in the vicinity of the accident at approximately 9:15 p.m., and he encountered appellant, who was hysterical and repeatedly asking "is he dead" and "who was driving." The officer located the vehicle in a small wooded area and discovered Etzinger, deceased, in the driver's seat. Emergency medical technicians ("EMTs") responded to the scene and transported appellant to the hospital for treatment.

{¶ 4} Following an investigation, appellant was indicted, on November 3, 2016, on seven counts: (1) driving under financial responsibility law suspension or cancellation

3.

("DUS"), in violation of R.C. 4510.16(A) and (D)(1), an unclassified misdemeanor, (2) operating a vehicle under the influence ("OVI") of a listed controlled substance or a listed metabolite, in violation of R.C. 4511.19(A)(1)(j)(ii) and (G)(1)(a), a first degree misdemeanor, (3) possession of drugs, in violation of R.C. 2925.11(C)(4)(a), a fifth degree felony, (4) involuntary manslaughter, in violation of R.C. 2903.04(A) and (C), a first degree felony, (5) involuntary manslaughter, in violation of R.C. 2903.04(B) and (C), a third degree felony, (6) reckless homicide, in violation of R.C. 2903.041(A) and (B), a third degree felony, and (7) aggravated vehicular homicide, in violation of R.C. 2903.06(A)(1)(a) and (B)(2)(b)(i), a first degree felony. Appellant pled not guilty.

{¶ 5} Appellant filed numerous pretrial motions, including three motions to suppress regarding evidence seized pursuant to a number of search warrants. Suppression hearings were held on October 5 and November 20, 2017. On January 4, 2018, the trial court denied the motions to suppress which are the subject of this appeal.[1]

{¶ 6} A five-day jury trial began on January 8, 2018, and ended on January 12, 2018. At the close of the state's case, the court granted appellant's Crim.R. 29 motion as to Count 3 of the indictment. Thereafter, the jury found appellant guilty of the remaining counts in the indictment.

{¶ 7} A sentencing hearing was held on March 13, 2018. The court, without objection, merged Counts 4 through 7. The state elected for appellant to be sentenced on

---

[1]Appellant argues, in her first and fourth assignments of error, that the trial court erred in denying her first and third motions to suppress, filed September 12 and 22, 2017, respectively. We will limit our analysis accordingly.

Count 7, and the court imposed a mandatory five-year prison term. With respect to Counts 1 and 2, the court imposed a $1,000 fine and a 180-day jail sentence, respectively, with the sentence to run concurrently with the prison term imposed in Count 7. Appellant also received a lifetime driver's license suspension. Appellant timely appealed.

**First Assignment of Error**

{¶ 8} Appellant argues the trial court erred in denying her third motion to suppress evidence obtained from her blood, which was seized pursuant to a search warrant that lacked probable cause, and from which the affiant omitted material facts. Appellant notes her blood was drawn at the hospital for medical purposes.

{¶ 9} In the August 4, 2016 affidavit for search warrant, Bowling Green Police Officer Andy Mulinix averred, inter alia, the following: (1) upon his arrival at the accident scene, he observed appellant near the street, covered in blood and talking about her boyfriend; (2) upon finding the crashed vehicle behind a tree line, "[i]t was evident from impact marks, damage to the vehicle and blood splatter[,] the vehicle had struck a large tree * * * [and] it was clear the point of impact to the tree was the passenger side door area. The roof and the front passenger side door were collapsed in toward the passenger side seat"; (3) on the tree there "appeared to be a large blood stain and what also appeared to be brain matter from [Etzinger]. At the base of the tree was also an almost completely intact human brain * * *. It was evident from the injury [suffered by Etzinger] the human brain next to the tree was [Etzinger's]"; (4) Etzinger was in the driver's seat but had broken blood vessels on his upper right shoulder which is consistent with a seatbelt injury, and the passenger's side seat belt was pulled out a significant

5.

amount "which led me to believe [Etzinger] was in the front passenger side seat during the crash with his seatbelt on"; (5) there was an empty case of beer in the back seat of the vehicle but no open beer cans; (6) there was a small amount of marijuana in a bag on the passenger side of the vehicle; (7) there was a can of computer duster ("duster") on the driver's floor and "[f]rom my training and experience I know that * * * duster * * * is used as a drug and is a highly abused inhalant"; (8) at the hospital, appellant had a seatbelt injury on her left collarbone and shoulder and she "admitted to being the driver of the vehicle but also stated [Etzinger] had been choking her around the neck prior to the crash* * * [and] she may have passed out as a result. * * * [She] denied she was intoxicated but she admitted [Etzinger] had been smoking marijuana in the vehicle prior to the crash"; and, (9) "[b]ased on my training, experience, and information collected during the course of the investigation, I believe there maybe [sic] additional evidence of Aggravated Vehicular Homicide * * * and [OVI], Drug Abuse * * *[at the hospital in blood samples taken from appellant]."

{¶ 10} Appellant submits the search warrant affidavit did not articulate probable cause to seize her blood, and likewise, the court, in denying her motion to suppress, did not articulate probable cause of intoxication or any other probable cause to seize her blood. Appellant further claims "[t]he affidavit fails to answer the key question of probable cause, why [the officer] had cause to believe he would find incriminating evidence." Appellant observes the affidavit averred that she denied being intoxicated, rather than stating that "none of the police officers involved in the accident made any statement that Ms. Moore was under the influence of anything." Appellant contends the

6.

presence of innocuous items, like duster, "'used by many innocent people-cannot, without more, transform a "bare bones" affidavit into one with a "substantial basis" for probable cause.' [*State v. Riley*, 6th Dist. Lucas No. L-07-1379, 2009-Ohio-3493] at ¶ 31."

{¶ 11} The state counters the evidence in appellant's vehicle that suggested substance abuse was enough to create probable cause for the warrant to secure appellant's blood and urine, which was drawn by the hospital following the accident. The state asserts the affidavit for search warrant to test appellant's blood indicated that the officer, based upon his investigation, had probable cause to believe appellant had committed aggravated vehicular homicide, OVI or drug abuse. The state notes the officer stated in the affidavit that he observed an empty case of beer, marijuana and can of duster in the vehicle. The state further contends it aroused the officer's suspicions that appellant moved Etzinger's dead body to the driver's seat as Etzinger's injuries and the damage to the vehicle confirmed that Etzinger was the passenger, not the driver.

{¶ 12} The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. *State v. Brown*, 183 Ohio App.3d 337, 2009-Ohio-3804, 916 N.E.2d 1138, ¶ 9 (6th Dist.). A person has a legitimate expectation of privacy in his or her bodily fluids. *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). A search warrant may only be issued upon a showing of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause for a search warrant exists when there is a "fair probability that

7.

contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Courts view the totality of the circumstances in making probable cause determinations. *Id.*

{¶ 13} A court reviewing the sufficiency of probable cause in an affidavit in support of a search warrant, should not substitute its judgment for that of the judge who issued the search warrant. *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph two of the syllabus. The task of the reviewing court is to determine whether the issuing judge "had a substantial basis for concluding that probable cause existed." *Id.* Trial courts and appellate courts should give great deference to the issuing judge's probable cause determination. *Id.*

{¶ 14} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. With respect to factual matters, the trial court occupies the best position to evaluate the credibility of witnesses and weigh the evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. Therefore, on appeal, we must accept the trial court's findings of facts so long as they are supported by competent, credible evidence. *Id.* We must then undertake a de novo review to determine whether the facts satisfy the applicable legal standard. *Burnside* at ¶ 8.

{¶ 15} Here, a review of the record shows the trial court did not err in denying appellant's motion to suppress evidence obtained from her blood. In its January 4, 2018 order on motions, the court referenced *State v. George* and *Illinois v. Gates*, for the proposition that the reviewing court's duty is to ensure the issuing judge had a substantial

8.

basis for concluding that probable cause existed. The court then determined the search warrant for appellant's blood was issued upon probable cause.

{¶ 16} Upon review, the August 4, 2016 search warrant for appellant's blood sample and urine sample, stated it sought evidence "which [is] in violation of * * * Aggravated Vehicular Homicide * * * and [OVI]." The search warrant affidavit identified certain objects and circumstances found in the vehicle following the accident, some of which were incriminating in nature. We find, considering the facts in the search warrant affidavit, as a whole, there is competent, credible evidence to support the trial court's determination that the search warrant seeking evidence in appellant's blood was issued upon probable cause. Accordingly, appellant's first assignment of error is not well-taken.

### Second Assignment of Error

{¶ 17} Appellant contends "[a]ll of the homicide charges against [her] require the State to prove that some sort of culpable conduct, or the *mens rea* of recklessness[,] was the proximate cause of the death," but the state did not present sufficient evidence, or any evidence, as to what caused the accident. Appellant claims there was no testimony that she was under the influence of anything at the time of the accident which would impair her ability to operate a vehicle.

{¶ 18} The state counters that since R.C. 4511.19(A)(1)(a) is a strict liability statute, the state only had to prove that appellant was under the influence while operating a vehicle. The state further contends since appellant's OVI conviction is a strict liability offense, her conviction for aggravated vehicular homicide, which is predicated on her

9.

violation of R.C. 4511.19(A)(1), is a strict liability offense as well.  The state references the trial testimony of Dr. Robert Forney, chief toxicologist at the Lucas County Coroner's ("coroner") Office, who stated appellant's blood tested positive for, inter alia, "cocaine/metabolites * * * and we identified benzoylecgonine, which is inactive - that does not produce the effect of cocaine - and we found it at .052 milligrams per liter."

{¶ 19} "A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 28, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  During a sufficiency of the evidence review, an appellate court's function is determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 20} Here, appellant was found guilty of the homicide crimes of involuntary manslaughter (Counts 4 and 5), reckless homicide (Count 6) and aggravated vehicular homicide (Count 7).  The court merged Counts 4 through 7, and appellant was sentenced on Count 7.  We will consider the sufficiency of the evidence as to Count 7 first.

### Aggravated Vehicular Homicide
### Count 7

{¶ 21} The crime of aggravated vehicular homicide is defined in R.C. 2903.06(A)(1)(a) as "[n]o person, while operating * * * a motor vehicle, shall cause the

10.

death of another * * * [a]s the proximate result of committing a violation of [R.C. 4511.19(A)]." R.C. 2903.06(A)(1) is a strict liability offense which requires no culpable mental state. *See State v. Gagnon*, 6th Dist. Lucas No. L-08-1235, 2009-Ohio-5185, ¶ 17.

{¶ 22} Appellant was charged with and convicted of a violation of R.C. 4511.19(A)(1)(j)(ii), which provides that no person shall drive if "[t]he person * * * has a concentration of cocaine in the person's whole blood or blood serum or plasma of at least fifty nanograms of cocaine per milliliter of the person's whole blood or blood serum or plasma." R.C. 4511.19(A)(1)(j)(ii) is a strict liability statute. *See City of Defiance v. Kretz*, 60 Ohio St.3d 1, 3, 573 N.E.2d 32 (1991). When determining whether a defendant committed this strict liability offense, the trier of fact is not required to find the defendant operated a motor vehicle while under the influence of drugs. *Id.* Rather, the trier of fact must only find the defendant's chemical test result was at the proscribed level and the defendant operated a motor vehicle within the state. *Id.*

{¶ 23} Here, appellant notes R.C. 4511.19 provides for a per se violation, and argues "it is possible for a per se violation of R.C. 4511.19 to constitute the predicate offense for a violation [of] R.C. 2903.06 and or R.C. 2903.04, the State must still prove that the predicate offense was the proximate cause of the accident." Appellant contends the predicate offense is based on a per se violation involving cocaine metabolite, which the state's expert, Dr. Forney, acknowledged was inactive. Appellant asserts the state did not ask Dr. Forney whether or not anything in her blood would have affected her ability to operate a vehicle.

11.

**{¶ 24}** Since appellant challenges the proximate cause or result element of the offense of aggravated vehicular homicide, we will limit our analysis accordingly.

**{¶ 25}** In *State v. Filchock*, 166 Ohio App.3d 611, 2006-Ohio-2242, 852 N.E.2d 759 (11th Dist.), Filchock argued the evidence was not sufficient to sustain the conviction of aggravated vehicular homicide because the victim's death "was not caused by * * * impaired driving, but from some other cause." *Id.* at ¶ 76. The appellate court held "'the definition of "cause" in criminal cases is identical to the definition of "proximate cause" in civil cases * * * [and] [t]he general rule is that a defendant's conduct is the proximate cause of * * * death to another if the defendant's conduct is a "substantial factor" in bringing about the harm.'" (Citation omitted.) *Id.* at ¶ 77. The court noted that the trial testimony revealed there could have been several causes of the victim's death, including Filchock operating a motor vehicle under the influence of alcohol; Filchock's reckless or negligent operation of a motor vehicle; the victim's slow speed; or Filchock's "monkey business" with another vehicle. *Id.* at ¶ 56.

**{¶ 26}** The court observed "the question for the jury was whether there was evidence beyond a reasonable doubt that Filchock's act of [operating] of a motor vehicle under the influence of alcohol was the direct cause of [the victim's] death, and without which [the death] would not have happened." *Id.* at ¶ 56. The court noted the evidence revealed Filchock "was observed to be swerving in and out of traffic, * * * was driving at a high rate of speed, * * * fled the scene without calling the police, * * * had a strong odor of alcohol on his person, * * * had bloodshot eyes * * * refused field-sobriety tests, and * * * [had a] blood-alcohol content * * * above the legal limit." *Id.* at ¶ 80. The

12.

court found the evidence, when viewed in the light most favorable to the prosecution, showed that "reasonable minds could conclude beyond a reasonable doubt that Filchock's operation of his motor vehicle under the influence of alcohol was the cause of [the victim's] death." *Id.* at ¶ 81. *See also State v. Lennox*, 11th Dist. Lake No. 2010-L-104, 2011-Ohio-5103.

{¶ 27} Here, a review of the record shows there is no evidence that appellant's act of driving with a prohibited concentration of cocaine in her blood was the direct cause of Etzinger's death, and without which, his death would not have occurred. The state furnished no evidence regarding the potential effects that a prohibited concentration of cocaine in a person's blood would have on a person, or on a person's ability to operate a vehicle. Without such evidence, the state failed to prove that as the proximate result of appellant driving with a prohibited concentration of cocaine in her blood, appellant caused Etzinger's death. As such, there was insufficient evidence to prove each element of the crime of aggravated vehicular homicide. Accordingly, appellant's second assignment of error with respect to Count 7 is well-taken.

{¶ 28} We will next consider the sufficiency of the evidence with respect to Counts 4 and 5, the involuntary manslaughter offenses.

### Involuntary Manslaughter
### Count 4

{¶ 29} Appellant was charged with and convicted of violating R.C. 2903.04(A) and (C), which states "[n]o person shall cause the death of another * * * as a proximate

13.

result of the offender's committing or attempting to commit a felony. * * * [A] [v]iolation * * * is a felony of the first degree."

{¶ 30} Appellant was initially charged with involuntary manslaughter while possessing cocaine in her system. The charge was later amended to indicate appellant was in possession of drugs, a violation of R.C. 2925.11(A), which states "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog."

{¶ 31} In *State v. Hamrick*, 6th Dist. Lucas No. L-96-059, 1997 WL 796455, *4 (Dec. 19, 1997), we analyzed a former version of R.C. 2903.04(A)[2] and found "we must construe 'proximate result' to include a direct nexus between a defendant's unlawful act and someone's death." We further found:

> The 'proximate result' phrase in R.C. 2903.04(A) means that, in order to commit involuntary manslaughter under this section, the defendant's felonious acts not only resulted in the death of another but that the criminal act was a proximate cause of the death. * * * *Jackson v. State* (1920), 101 Ohio St. 152, 127 N.E. 870, paragraph one of the syllabus; *State v. Schaeffer* (1917), 96 Ohio St. 215, 117 N.E. 220, paragraph seven of the syllabus.

---

[2]For purposes of this appeal, there is no meaningful difference between the former and current versions of R.C. 2903.04(A).

14.

{¶ 32} Here, the record shows appellant was driving a vehicle on the evening of August 3, 2016, with Etzinger as the passenger, when the vehicle crashed into a tree and Etzinger was killed. Testimony was presented that appellant may have been speeding, about ten m.p.h. over the speed limit, prior to the crash. After the accident, police found an empty case of beer in the back seat of the vehicle, a small amount of marijuana in a bag on the passenger side, and a can of duster on the driver's floor.

{¶ 33} The state produced the test result report for appellant's blood and urine samples, which revealed the presence of several controlled substances. Appellant admitted using illegal drugs several days prior to the accident, but denied using any illegal drugs on the day of the accident. Texts messages sent by appellant hours before the accident indicate she was seeking to buy pills from someone. Dr. Forney testified regarding the particular controlled substances found in appellant's blood and urine samples and specifically noted Xanax, or alprazolam, was found in appellant's system, which has a tranquilizing, calming result and it was "still having its effect" even though it had "been awhile since the Xanax or the generic alprazolam was ingested."

{¶ 34} The state also presented evidence that the can of duster found in the vehicle was missing its safety tab and was approximately 20 percent lighter by weight than a full can of duster. Dr. Forney was shown the test result report for appellant's blood and urine samples, which showed a positive finding in the blood for diflouroethane. The doctor testified diflouroethane is a chemical, in particular a propellant, found in products like duster. In addition, Officer Darin Reinhart testified that duster is a well-known abused

15.

inhalant which causes an instant high, lasting for a short period of time, and huffing, or abusing an inhalant, can also cause a person to pass out and lose consciousness.

{¶ 35} A review of the evidence, in a light most favorable to the state, shows any rational trier of fact could have found appellant caused Etzinger's death as a proximate result of knowingly using alprazolam (Xanax) and/or diflouroethane (duster chemical). We therefore find the state presented sufficient evidence to prove each element of Count 4, involuntary manslaughter, in violation of R.C. 2903.04(A) and (C). Accordingly, appellant's second assignment of error with respect to Count 4 is not well-taken.

## Count 5

{¶ 36} Appellant was charged with and convicted of violations of R.C. 2903.04(B) and (C), which state "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor * * *. [A] [v]iolation * * * is a felony of the third degree."

{¶ 37} Appellant was initially charged with involuntary manslaughter while DUS, as well as involuntary manslaughter while OVI, in violation of R.C. 4511.19(A)(1)(j) and (G). The charge was later amended to indicate a violation of R.C. 4511.19(A)(1)(a), which states '[n]o person shall operate any vehicle * * * within this state, if, at the time of the operation * * * [t]he person is under the influence of * * * a drug of abuse."

## Involuntary Manslaughter - OVI

{¶ 38} A person is under the influence as a "result of a consumption of a substance which tends to deprive one of the clearness of intellect and control that he or she would

otherwise possess. *State v. Hardy* (1971), 28 Ohio St.2d 89, 276 N.E.2d 247." *State v. Smith*, 6th Dist. Ottawa No. OT-97-037, 1998 WL 102143, *3 (Feb. 27, 1998). A "drug of abuse" is defined in R.C. 4506.01(M) as "any controlled substance, dangerous drug as defined in section 4729.01 of the Revised Code, or over-the-counter medication that, when taken in quantities exceeding the recommended dosage, can result in impairment of judgment or reflexes." A person can be under the influence of a drug of abuse if the drug or medication "impairs the person's ability to operate a motor vehicle." *Smith* at *3.

{¶ 39} Here, a review of the record shows the state produced test results of appellant's blood and urine samples which revealed the presence of controlled substances or drugs of abuse. In addition, the state presented the testimony of Dr. Forney and Officer Reinhart regarding certain effects that drugs like alprazolam and diflouroethane can have on a person. We find after viewing this evidence in a light most favorable to the state, any rational trier of fact could have found appellant caused Etzinger's death as a proximate result of operating a vehicle within this state under the influence of a drug of abuse (alprazolam and/or diflouroethane). We therefore find the state offered sufficient evidence to prove each element of Count 5, involuntary manslaughter OVI.

### Involuntary Manslaughter - DUS

{¶ 40} Driving a vehicle under financial responsibility law suspension is a violation of R.C. 4510.16(A) and (D)(1), which is an unclassified misdemeanor. A review of the record shows appellant admitted her driver's license was suspended at the time of the accident.

17.

{¶ 41} In order for appellant to be found guilty of the crime of involuntary manslaughter DUS, the state had to prove that appellant caused Etzinger's death as a proximate result of appellant driving with a suspended driver's license.

{¶ 42} In *Hamrick*, 6th Dist. Lucas No. L-96-059, 1997 WL 796455, *4, we held "when a defendant's unlawful act is driving under suspension * * * [that act] cannot constitute the basis for an involuntary manslaughter conviction when there is no causative connection between the criminal act and the death of another."

{¶ 43} Here, a review of the record shows there is no evidence that Etzinger's death was a proximate result of appellant's status of driving while under a license suspension. We therefore find the state's evidence was insufficient to prove each element of Count 5, involuntary manslaughter while driving under suspension, in violation of R.C. 2903.04(A) and (C). Accordingly, appellant's second assignment of error with respect to Count 5, involuntary manslaughter DUS, is well-taken.

{¶ 44} Last, we will consider the sufficiency of the evidence with respect to Count 6, reckless homicide.

### Reckless Homicide
### Count 6

{¶ 45} Appellant was charged with and convicted of violations of R.C. 2903.041(A) and (B), which state "[n]o person shall recklessly cause the death of another * * *. [A] [v]iolation * * * is a felony of the third degree."

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that

the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist. R.C. 2901.22(C).

{¶ 46} Here, the record shows appellant and Etzinger were arguing on the evening of August 3, 2016, prior to getting into the vehicle. In fact, they were told to leave appellant's parents' home because they were "very loud * * * [v]ery aggressive * * * there was screaming." Appellant testified she and Etzinger got into the vehicle and she was driving because he was mad. The arguing continued and Etzinger hit appellant, which caused her to swerve and hit a garbage can. She stated, "[a]fter I hit it, I remember being pissed off. * * * I just bought the car and I was mad because I hit the trash can." Appellant testified Etzinger then started choking her and grabbing her by the throat. Appellant did not remember going off of the road or striking the tree.

{¶ 47} The record also reveals appellant may have been speeding before she lost control of the vehicle crashed into the tree, and controlled substances were found in blood and urine samples taken from appellant shortly after the accident.

{¶ 48} Evidence establishing recklessness when operating a vehicle includes the consumption of an excessive amount of a controlled substance, speeding and having toxicology test results consistent with impairment. *See State v. Yates*, 6th Dist. Lucas No. L-13-1266, 2015-Ohio-708, ¶ 16.

19.

{¶ 49} Here, there was sufficient evidence that appellant acted recklessly prior to the accident, as she was driving while arguing with Etzinger, she was mad at him, she had controlled substances in her system, she may have been speeding and she lost control of the vehicle. We therefore find the state presented sufficient evidence to prove appellant recklessly caused Etzinger's death. Accordingly, appellant's second assignment of error with respect to Count 6 is not well-taken.

### Third Assignment of Error

{¶ 50} Appellant argues the trial court erred when it failed to dismiss Count 4 of the indictment, involuntary manslaughter, in violation of R.C. 2903.04(A) and (C), by operation of law, after dismissing Count 3, the predicate charge of possession of drugs.

{¶ 51} Count 3 charged appellant with possession of cocaine, in violation of R.C. 2925.11(C)(4)(a). This charge was dismissed by the trial court on appellant's Crim.R. 29 motion. The court found *State v. Lowe*, 86 Ohio App.3d 749, 621 N.E.2d 1244 (4th Dist.1993), controlling. The issue presented in *Lowe* was "whether the presence of cocaine metabolites in a person's urine constitutes sufficient circumstantial evidence to prove beyond a reasonable doubt that the person knowingly obtained, possessed, or used a controlled substance in violation of R.C. 2925.11(A)." *Id.* at 753. The *Lowe* court found "the fact that a person's urine contains cocaine metabolites does not, standing alone, constitute sufficient evidence that the person knowingly ingested the controlled substance." *Id.* at 756.

{¶ 52} Here, although Count 3, possession of cocaine, was dismissed, its dismissal had no impact on the involuntary manslaughter offense in Count 4, which charged

20.

appellant with violating R.C. 2903.04(A) That statute provides "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." Appellant was initially charged with involuntary manslaughter while possessing cocaine in her system but the charge was amended to possession of drugs, a violation of R.C. 2925.11(A), which states "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." As we found above, there was sufficient evidence to prove each element of the involuntary manslaughter offense in Count 4. Accordingly, appellant's third assignment of error is not well-taken.

## Fourth Assignment of Error

{¶ 53} Appellant argues her first motion to suppress should have been granted and the test results on her blood should have been suppressed because the state failed to prove substantial compliance with required Ohio Department of Health ("DOH") regulations, as required by R.C. 3701.143. Appellant contends substantial compliance requires that there be, at most, *de minimus* deviations, but in this case there were serious deviations, including (1) no evidence that any procedures existed to prevent tampering with blood samples; (2) no testimony that the samples were sealed so that tampering would be indicated; (3) no chain of custody proven for the unsecured blood from the time it was drawn until Det. Mulinix seized it; (4) no testimony to verify there was no tampering with the blood samples while they were in the refrigerator in police custody from August 4 until August 9, 2016; and (5) insufficient testimony to determine what type of

21.

anticoagulant was used. Appellant also claims during the suppression hearing defense counsel was not permitted to question Dr. Forney about "the margin of error, or the reliability of the test at those specific levels."

{¶ 54} When the validity of a drug test is challenged by the defendant, the state has the burden of establishing the testing procedures substantially complied with DOH regulations. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71 at ¶ 24. The substantial compliance standard is limited "to excusing only errors that are clearly de minimis," which include irregularities amounting to "'minor procedural deviations.'" *Id.* at ¶ 34, quoting *State v. Homan*, 89 Ohio St.3d 421, 426, 732 N.E.2d 952 (2000). If the state shows substantial compliance with the regulations, the test result is presumptively admissible, and the burden shifts to the defendant to show prejudice resulting from "anything less than strict compliance." *Burnside* at ¶ 24.

{¶ 55} As set forth above, appellate review of a motion to suppress presents a mixed question of law and fact. *Id.* at ¶ 8. We must then undertake a de novo review to determine whether the facts satisfy the applicable legal standard. *Id.*

{¶ 56} Here, we must determine whether or not there was substantial compliance with R.C. 4511.19(D)(1)(b), which states in relevant part:

> In any criminal prosecution * * * for a violation of division (A) * * *
> of this section * * * that is vehicle-related, the court may admit evidence on
> the concentration of * * * drugs of abuse, controlled substances,
> metabolites of a controlled substance, or a combination of them in the
> defendant's whole blood, blood serum or plasma * * * at the time of the

22.

alleged violation as shown by chemical analysis of the substance withdrawn within three hours of the time of the alleged violation. * * * The court may admit evidence on the concentration of * * * drugs of abuse * * * when * * * a blood or urine sample is obtained pursuant to a search warrant. * * *

The bodily substance withdrawn under division (D)(1)(b) of this section shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code.

**{¶ 57}** R.C. 3701.143 requires the director of health to "determine, or cause to be determined, techniques or methods for chemically analyzing a person's whole blood." Then, the director must "approve satisfactory techniques or methods, ascertain the qualifications of individuals to conduct such analyses, and issue permits to qualified persons authorizing them to perform such analyses." DOH, pursuant to this mandate, promulgated regulations which are set forth in Ohio Adm.Code 3701-53-01 et seq.

**{¶ 58}** At the suppression hearings, several witnesses were called to testify. The relevant testimony follows.

**{¶ 59}** Dalibor Tomljenovic testified he is a registered nurse and worked at the Wood County Hospital ("hospital") emergency room ("ER"). He stated the hospital has policies and procedures in effect for obtaining venipuncture specimen, and he received training on them when he was hired.

**{¶ 60}** On the evening of August 3, 2016, Tomljenovic was working at the hospital and assigned to the trauma rooms when appellant became his patient. At

23.

approximately 9:55 p.m., shortly after appellant's arrival, he obtained a blood sample from appellant, which was standard hospital procedure.

{¶ 61} Tomljenovic testified he used an IV start kit, which is a prepackaged, sterile unit, and a non-alcohol type swab to obtain the blood sample. The blood was collected in vials, which were properly sealed. There were five or six vials, some had solid anticoagulant and some had liquid anticoagulant. Tomljenovic put the time of the blood draw and his initials on the patient identifying labels, which have the patient's name, date of birth and medical record number. He placed the vials in a Ziplock-type bag and passed the bag to his charge nurse or a fellow employee to take to the lab, as he did not want to leave appellant unattended. Tomljenovic testified the manner in which he obtained the blood was in accordance with the hospital's policies and procedures.

{¶ 62} Judy Ubben testified that she is a medical technologist and is the Outreach and Phlebotomy Supervisor in the laboratory at the hospital. She started working at the hospital in 1995 and has worked in the lab the entire time. The lab has a permit to operate from the Ohio director of health. Ubben stated the hospital has written policies and procedures for blood testing and urine samples. Specimens are drawn for testing and brought to the lab by a member of the ER, where the specimens are prepared for testing and tested on analyzers. After testing, the samples are placed in racks and the racks are placed in the refrigerator at the end of the third shift, which is midnight. Ubben was not personally involved in appellant's case.

{¶ 63} Bowling Green Police Department Detective Andy Mulinix testified he was called into work on August 3, 2016, in reference to a fatal crash. He assisted Officer

24.

Reinhart in creating the search warrant for appellant's blood and urine samples at the hospital. Detective Mulinix executed the search warrant at the hospital, obtained the evidence and took it to "our property officer." The detective was shown a property control form from the coroner for the property he picked up at the hospital, which ultimately was relayed to the coroner's office.

{¶ 64} Dr. Robert Forney testified he is the chief toxicologist in the coroner's office, and appellant's blood samples were received in vials which, to his knowledge, were sterile and vacuum sealed when the blood was collected. The doctor explained the internal and external chains of custody of the specimen, which included examining the material for its integrity, to ensure it was being properly sealed and labeled. The doctor had no personal knowledge of the chain of custody at the hospital or police department.

{¶ 65} Dr. Forney testified the vials of appellant's blood, which contained a solid anticoagulant, were properly sealed and labeled and also refrigerated when not under examination. He stated refrigeration slows down bacterial growth, although "[w]e are not really that worried about bacterial growth, but it's a standard laboratory practice" to refrigerate blood samples, although the vials of blood have a preservative in them. The doctor maintained records of refrigerant control and monitored temperatures at the lab, but he had no personal knowledge of the refrigerant conditions of the samples prior to receiving them.

{¶ 66} Dr. Forney noted blood or blood serum tests in the lab are conducted per DOH standards, which is his responsibility to oversee. He stated he is certified, as are the laboratory personnel, which means they have valid permits issued by the director of

25.

health pursuant to R.C. 3701.143. The doctor testified the coroner's office maintains a chain of custody of test results on samples for not less than three years, and with respect to positive blood and urine samples, they are retained for not less than one year, in accordance with Ohio Adm.Code 3701-53-05. He also stated the lab successfully completes a national proficiency testing program using techniques or methods for which the laboratory personnel obtain permits under Ohio Adm.Code 3701-53-09. The coroner's office has a written procedure manual, which is updated periodically, for techniques or methods used for testing for alcohol or drugs of abuse in bodily substances, which is in compliance with Ohio Adm.Code 3701-53-06. Dr. Forney, as lab director, also ensures certain procedures are followed, including maintaining documents, and supervising and monitoring laboratory technicians, who are adequately trained and experienced to perform testing on bodily substances for alcohol and drugs of abuse.

{¶ 67} Dr. Forney testified on October 21, 2016, he signed a report of the analyses for Bowling Green Police on appellant's specimens, to certify the results.

{¶ 68} Megan Meyer testified she works at the coroner's office forensic toxicology lab. Meyer signed for appellant's blood vials and samples when they were received into the lab on August 9, 2016. She was shown the property control form which showed two vials of appellant's blood were received. She conducted the screening on appellant's blood, in accordance with the methods and techniques used the procedural manual for the coroner's office. Ms. Meyer was shown and identified the lab report containing the results of the tests of appellant's blood.

26.

{¶ 69} In its January 4, 2018 order, the trial court found appellant's blood was drawn as a matter of medical treatment, within three hours of the alleged violation, as required by R.C. 4511.19(D)(1)(b), and the blood sample was obtained pursuant to a search warrant.

{¶ 70} The court noted it was argued that the blood was not collected and handled as required by DOH, which is set forth in Ohio Adm.Code 3701-53-05. The court explained the circumstances under which the nurse drew appellant's blood using Betadine, which is a non-volative antiseptic. The court then addressed the argument that the laboratory that analyzed the blood failed to comply with DOH requirements as set forth in Ohio Adm.Code 3701-53-06. The court stated '[t]he blood that was tested in this case went from the Wood County Hospital to The Lucas County Coroner then to a reference lab. All properly credentialed facilities, as discussed above." The court denied the motion to suppress.

{¶ 71} Ohio Adm.Code 3701-53-05 states the requirements for the collection and handling of blood and urine specimens, as follows:

(A) All samples shall be collected in accordance with section 4511.19 * * *.

(B) When collecting a blood sample, an aqueous solution of a non-volatile antiseptic shall be used on the skin. No alcohols shall be used as a skin antiseptic.

(C) Blood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant * * *.

27.

* * *

(E)  Blood and urine containers shall be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:

(1)  Name of suspect;

(2)  Date and time of collection;

(3)  Name or initials of person collecting the sample; and

(4)  Name or initials of person sealing the sample.

(F)  While not in transit or under examination, all blood and urine specimens shall be refrigerated.

{¶ 72} Ohio Adm.Code 3701-53-06 sets forth the requirements for laboratories.

{¶ 73} Here, appellant raises no arguments that the state did not comply with Ohio Adm.Code 3701-53-06.  Therefore, we will limit our analysis to appellant's assertion that the state failed to prove substantial compliance with DOH regulations, and violated Ohio Adm.Code 3701-53-05.

{¶ 74} A review of the record shows the state presented the testimony of several witnesses to establish its compliance with the regulations for obtaining, handling and testing appellant's blood sample.  The state also submitted exhibits in support of its position.

{¶ 75} We find the state offered evidence that the nurse drew appellant's blood, using a non-alcohol swab, within three hours of the accident.  The blood was collected in vials, which were properly sealed and labeled, and some of which contained a solid

28.

anticoagulant. The vials were obtained by police, pursuant to a search warrant, and forwarded to the coroner's office for testing. When the vials of appellant's blood were received by the coroner's office, the vials were examined for their integrity, and were found to be properly sealed and labeled, and containing a solid anticoagulant.

{¶ 76} While there was no testimony that the vials were sealed in a manner that tampering would be indicated, there was also no testimony that any tampering had occurred or been attempted with the vials. Rather, the testimony that was presented clearly indicates the vials received by the coroner's office for testing were properly sealed and labeled. We therefore find the state demonstrated it substantially complied with Ohio Adm.Code 3701-53-05(A), (B), (C) and (D).

{¶ 77} With respect to the refrigeration of appellant's blood specimen, we find the state did not present evidence that appellant's blood was always refrigerated while not in transit or under examination, as required by Ohio Adm.Code 3701-53-05(F). However, the state did offer testimony that the blood was refrigerated a considerable portion of the time when it was not in transit or being tested. In addition, Dr. Forney's testimony indicated refrigeration slows down bacterial growth, but "[w]e are not really that worried about bacterial growth." The doctor also noted the vials of blood had a preservative in them. We find, based on the foregoing, the state's failure to meet the refrigeration of blood requirement is de minimis. We therefore find the state substantially complied with Ohio Adm.Code 3701-53-05(F).

{¶ 78} Since the state demonstrated substantial compliance with the regulations, the test results were presumptively admissible, so the burden shifted to appellant to show

29.

she was prejudiced by the state's less than strict compliance. Appellant failed to sustain this burden as she offered no evidence that she was adversely affected. We therefore find the trial court did not err in denying appellant's motion to suppress. Accordingly, appellant's fourth assignment of error is not well-taken.

## Fifth Assignment of Error

{¶ 79} Appellant contends the state failed to present sufficient evidence of a violation of R.C. 4511.19, the general OVI statute. As we found in appellant's second assignment of error, there was sufficient evidence to prove each element of involuntary manslaughter while operating a vehicle under the influence, in Count 5, as amended. Accordingly, appellant's fifth assignment of error is not well-taken.

## Sixth Assignment of Error

{¶ 80} Appellant asserts the state engaged in severe prejudicial behavior which "cumulatively and specifically resulted in Plain Error by the Trial Judge in not declaring an immediate mistrial." Appellant contends the state referred to the jury as "John's jury" when introducing Etzinger's mother and the mother of his children to the jury, which appellant claims, "is unacceptable." In addition, during closing argument, appellant argues the state: repeatedly referenced facts not in evidence (that appellant was stoned while driving even though there was no testimony appellant was under the influence); presumed the testimony of witnesses who did not testify (ER doctor, Dr. Ashraf, and EMTs); denigrated the defense and its expert witnesses; told the jury recklessness should be a foregone conclusion; asked the jury to imagine what the deceased would say and envision his hands rising from the grave; and misrepresented reasonable doubt.

30.

Appellant observes defense counsel did not object to these remarks nor did the judge comment on them. Appellant submits "[t]aken as a whole, and when weighed against the weak evidence presented by the State, [appellant] was deprived of a fair trial, and the outcome would have been different but for these statements."

{¶ 81} The test for prosecutorial misconduct is whether the statements complained of deprived the defendant of a fair trial. *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987); *State v. Roughton*, 132 Ohio App.3d 268, 286, 724 N.E.2d 1193 (6th Dist.1999). The prosecutor's remarks must be considered in the context of the entire trial. *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). Since appellant failed to object to the prosecutor's statements throughout the trial and during closing argument, she forfeited of all but plain error on appeal. *See State v. Jackson*, 92 Ohio St.3d 436, 438, 751 N.E.2d 946 (2001).

{¶ 82} Crim.R. 52(B), plain error, states "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain * * * within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must

31.

have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 83} The standard of review under plain error "is a strict one." *State v. Murphy*, 91 Ohio St.3d 516, 532, 747 N.E.2d 765 (2001). Under the plain error standard, "the defendant bears the burden of demonstrating that a plain error affected his substantial rights." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.

{¶ 84} Here, appellant did not cite to any authority in support of her position that the prosecutor's statements were improper or that the prosecutor engaged in severely prejudicial behavior or misconduct by making the statements. "It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record." *State v. Taylor*, 9th Dist. Medina No. 2783-M, 1999 WL 61619, * 3 (Feb. 9, 1999). An appellant has the burden of demonstrating error on appeal. *See* App.R. 16(A)(7), which states "[t]he appellant shall include in its brief * * *[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." This basis alone is sufficient to dispose of appellant's assignment of error. Nevertheless, we will address the assigned error.

{¶ 85} Upon review of the over 1,400 pages of the trial transcript, and paying particular attention to the challenged prejudicial behavior of the prosecutor, we find the prosecutor's statements did not deprive appellant of a fair trial. Although we find some

32.

of the prosecutor's comments were inappropriate, when we consider the comments in the context of the entire trial, as we are required to do, and in light of the plain-error standard, we cannot say that but for the prosecutor's comments, appellant would have been acquitted. We therefore we find appellant has not demonstrated plain error in the trial court's decision to not immediately declare a mistrial based on the prosecutor's behavior. Accordingly, appellant's sixth assignment of error is not well-taken.

## Seventh Assignment of Error

{¶ 86} Appellant contends she was denied due process of law and a fair trial due to the cumulative effect of errors by the trial court. Appellant argues the errors included the admission of prejudicial evidence over objection, repeated testimony about the gruesome nature of Etzinger's injuries over objection and irrelevant testimony, as well as animosity between the trial court and defense counsel and the timing of when the case was given to the jury.

{¶ 87} The cumulative error doctrine provides that, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. Thus, "[s]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together." *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). In order to determine whether the cumulative error doctrine applies, there must first be a finding that multiple errors were committed at trial. *Id.* Then, there must be a finding that there is a reasonable

33.

probability the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Moreland*, 50 Ohio St.3d 58, 69, 552 N.E.2d 894 (1990).

{¶ 88} Here, other than the standard for the cumulative error doctrine, appellant cites to no legal authority in support of her position. As noted above, appellant has the burden of demonstrating error on appeal. App.R. 16(A)(7). This basis alone is sufficient to dispose of appellant's assignment of error. However, we will consider the assigned error.

{¶ 89} Appellant references the following two instances of Etzinger's mother's testimony in support of her argument that the trial court erroneously allowed repeated testimony about the gruesome nature of Etzinger's injuries: Etzinger's mother was not permitted to see her son's body due to his head injury and a closed casket was required.

{¶ 90} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. An abuse of discretion constitutes more than an error of law or judgment, it implies the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Relevant evidence is generally admissible under Evid.R. 402, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Yet, evidence must be excluded when its "probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A).

34.

{¶ 91} Here, upon review, we find nothing gruesome, unfairly repetitive or prejudicial in Etzinger's mother's testimony. Thus, the court did not abuse its discretion in allowing this testimony.

{¶ 92} Appellant further claims the court allowed testimony which had no relevance to whether appellant's having inactive cocaine metabolite in her system at the time of the crash was the proximate cause of the accident. In particular, appellant cites to Etzinger's mother's testimony that a closed casket was required and that appellant did not attend the funeral.

{¶ 93} Upon review, we find the court acted within its discretion in allowing the challenged testimony, as the testimony concerning the closed casket was relevant and probative as to the nature, in general, of Etzinger's injuries, and appellant's failure to attend Etzinger's funeral was arguably relevant to indicate consciousness of guilt.

{¶ 94} Appellant also asserts there was obvious animosity between the trial court and defense counsel "that was on display to the Jury," including the court making a joke at defense counsel's expense. Appellant claims there were "many examples of this sort of bickering and hostility."

{¶ 95} The only instance of animosity between the trial court and defense counsel mentioned by appellant was a comment uttered by the judge, which appellant describes as a joke made at defense counsel's expense. Upon review, the challenged statement was the judge's attempt at humor, and was neither nasty nor hostile. We do not find this one comment establishes obvious animosity between the judge and defense counsel, nor do we find this comment prejudicial to appellant.

{¶ 96} With respect to the timing of when the case was given to the jury, appellant notes the court charged the jury at 5:00 p.m. on Friday, before a three day weekend, in the midst of a snowstorm, with no indication how long the jury would be held. Appellant submits "[u]nsurprisingly, the Jury returned a verdict by 7:16 following 5 days of trial."

{¶ 97} Upon review, appellant has not demonstrated how the trial court committed error by submitting the case to the jury when it did. The court had no control over the weather and had limited control over when the trial ended. Moreover, appellant has not shown how she was prejudiced by the timing of the case going to the jury.

{¶ 98} In light of the foregoing, the record does not support a finding that there were multiple errors at appellant's trial such that the cumulative error doctrine would be applicable. Accordingly, appellant's seventh assignment of error is not well-taken.

### Eighth Assignment of Error

{¶ 99} Appellant asserts her convictions are against the manifest weight of the evidence. The standard of review for manifest weight is the same in a criminal case as in a civil case, and an appellate court's function is to determine whether the greater amount of credible evidence supports the verdict. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; *State v. Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. "A manifest weight of the evidence challenge contests the believability of the evidence presented." (Citation omitted.) *State v. Wynder*, 11th Dist. Ashtabula No. 2001-A-0063, 2003-Ohio-5978, ¶ 23. When determining whether a conviction is against the manifest weight, the appellate court must review the record, weigh the evidence and all reasonable inferences drawn from it, consider the witnesses' credibility

36.

and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio 6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *Thompkins* at 387.

{¶ 100} It has long been held that the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to decide. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). When reviewing a manifest weight of the evidence challenge, an appellate court sits as the "thirteenth juror." *Prescott* at ¶ 48, citing *Thompkins* at 387.

{¶ 101} Here, appellant argues that she offered a credible reason for the accident: she was attacked by Etzinger, who had a history of domestic violence. Appellant maintains the state never presented a good reason why her version of the accident was unacceptable. Appellant submits the jury lost its way and forgot that they needed facts to convict, not outrage by the prosecutor.

{¶ 102} Since we have already determined there was insufficient evidence to support appellant's convictions with respect to Count 5, involuntary manslaughter DUS ("5-IM-DUS") and Count 7, aggravated vehicular homicide, we will undertake a manifest weight of the evidence analysis as to her remaining convictions: Counts 1; 2; 4; 5, involuntary manslaughter OVI ("5-IM-OVI"); and 6.

{¶ 103} A review of the record shows appellant testified that while she was driving prior to the accident, Etzinger hit her, grabbed her throat and choked her. The next thing appellant recalled was that it was really dark, she looked to the right and

37.

Etzinger was leaning on her. Appellant described where on her face and throat she was hit, grabbed and choked, and she explained how and with what hand Etzinger attacked her. Appellant also offered evidence of Etzinger's violent past with his ex-girlfriend.

{¶ 104} The state presented evidence that prior to the accident, appellant was driving, she and Etzinger were arguing, she was mad at Etzinger, she had controlled substances in her system and she may have been speeding when she lost control of the vehicle. The state provided evidence that after the accident, several items were found in the vehicle, including: an empty case of beer, in the back seat, but no open beer cans; a small amount of marijuana in a bag on the passenger side; and a can of duster on the driver's side floor. The state also offered evidence that appellant: moved Etzinger's dead body to the driver's seat of the vehicle and placed his hand on the gear shift; told lies on several occasions concerning being pregnant and using drugs; and gave a number of inconsistent accounts and explanations regarding where Etzinger hit or punched her before the accident, whether Etzinger was a violent person, and for what purpose the duster was purchased.

{¶ 105} The state further offered testimony that appellant was a drug addict, yet she denied using drugs on the day of the accident. The state presented evidence as to the particular controlled substances found in appellant's blood and urine samples, as well as the effects that drugs like alprazolam and diflouroethane can have on a person. In addition, the stated provided evidence that the can of duster found in the vehicle after the accident was missing its safety tab and was approximately 20 percent lighter by weight

38.

than a full can of duster, which indicated that it had been used from the time it was purchased, which was immediately before the accident.

{¶ 106} After reviewing the entire record and weighing the evidence and all reasonable inferences, we cannot say the jury lost its way and created a manifest miscarriage of justice, with respect to Counts 1, 2, 4, 5-IM-OVI and 6. The jury was able to view the witnesses and observe their demeanors, consider the witnesses' credibility and resolve conflicts in the evidence, as to Counts 1, 2, 4, 5-IM-OVI and 6. Appellant's convictions as to Counts 1, 2, 4, 5-IM-OVI and 6 are not against the manifest weight of the evidence. Accordingly, appellant's eighth assignment of error is not well-taken as to Counts 1, 2, 4, 5-IM-OVI and 6.

## Summary

{¶ 107} We find appellant's first, third, fourth, fifth, six and seventh assignments of error not well-taken.

{¶ 108} We find appellant's second assignment of error not well-taken as to Counts 1, 2, 4, 5-IM-OVI and 6, but we find appellant's second assignment of error well-taken as to Count 5-IM-DUS and Count 7.

{¶ 109} We find appellant's eighth assignment of error not well-taken as to Counts 1, 2, 4, 5-IM-OVI and 6, but we find appellant's eighth assignment of error well-taken as to Count 5-IM-DUS and Count 7.

{¶ 110} We affirm appellant's convictions as to Counts 1, 2, 4, 5-IM-OVI and 6.

{¶ 111} We reverse and vacate appellant's convictions as to Count 5-IM-DUS and Count 7.

39.

## Conclusion

**{¶ 112}** On consideration whereof, the judgment of the Wood County Common Pleas Court is affirmed, in part, and reversed, in part. We reverse and vacate appellant's convictions for involuntary manslaughter while driving under suspension, and for aggravated vehicular homicide. We affirm the remainder of appellant's convictions. The bail granted to appellant pending appeal is ordered terminated. This matter is remanded for further proceedings consistent with this opinion. The parties are ordered to split the costs of this appeal pursuant to App.R. 24.

**{¶ 113}** Judgment affirmed, in part, and reversed and vacated, in part.

Judgment affirmed, in part, and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                        _____

JUDGE

Christine E. Mayle, P.J.

_____

Gene A. Zmuda, J.              JUDGE

CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.