[Cite as *State v. Massucci*, 2021-Ohio-88.]

COURT OF APPEALS
LUCAS COUNTY, OHIO
SIXTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| | : | |
| -vs- | : | Sitting by Assignment by the |
| | : | Ohio Supreme Court |
| | : | |
| MICHAEL MASSUCCI | : | Case No. G-4801-CL-201901302-000 |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Lucas County Court of Common Pleas, Case No. G-4801-CR-201901422-000

JUDGMENT:      REVERSED AND REMANDED

DATE OF JUDGMENT ENTRY:      January 15, 2021

APPEARANCES:

For Plaintiff-Appellee:

EVY M. JARRET
Lucas County Prosecutor's Office
700 Adams Street, Suite 250
Toledo, OH 43604

For Defendant-Appellant:

ANDREW R. MAYLE
MAYLE LLC
P.O. Box 263
Perrysburg, OH 43552

*Delaney, J.*

{¶1}   Appellant Michael Massucci appeals from the December 3, 2019 Judgment Entry of the Lucas County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2}   This case arose on August 29, 2018, around 4:00 p.m., when appellant struck a road worker on U.S. Route 24, killing the victim instantly.

*The crash: Alec Myers observes a motorist strike and kill his coworker*

{¶3}   Nathan Soto and Alec Myers worked for The Gerken Companies doing road paving, milling, and construction.  Around 3:30 p.m. on August 29, 2018, their last task of the day was placing orange barrels along a concrete wall on U.S. Route 24 in an area near Fallen Timbers.  Both men wore their regular work attire: jeans, t-shirts, and bright neon yellow-orange safety vests.  The men arrived at the scene in a Gerken paving truck, a 2013 Chevy Silverado pickup truck weighing 6311 pounds.  The truck has a "360 light" on top of the cab, lights on the fender, and lights on the tool box in the bed.  Myers testified these lights were in operation and working immediately prior to the crash.  T. 245.

{¶4}   U.S. Route 24 is a divided highway running east and west.  When the crash occurred, U.S. Route 24 was under construction for a paving project.  The eastbound lanes were recently paved, with only a dashed white line separating the right and left hand lanes.  The outside edge of the traveled portion of the roadway was not marked in any traditional fashion.  A stone berm and guardrail border the southern edge of the roadway. The northern side of the roadway has a concrete median divider which separates the east and westbound sides of U.S. Route 24.  The surface of the roadway was new asphalt at the time of the crash.  There were no obvious defects which would have prevented safe

travel of motor vehicles.   Appellee's Ex. 3, Ohio State Highway Patrol (OSHP) Reconstruction Report, 2.  When traveling eastbound on U.S. Route 24 in the area of the collision, a slight left hand curve is present, as well as a slight upwards grade.   The roadway ascends this slight grade in order to overpass a set of railroad tracks.  Id., 3.

{¶5}   Approaching the scene of the crash, an eastbound driver would first pass two signs stating "Road Construction Ahead."   A short distance further, two signs indicated "No Edge Lines."

{¶6}   Soto and Myers parked the Gerken truck on what would have been the berm of the highway if edge lines had been present.  The truck was not in the lane of travel; it was approximately 2 to 3 feet away from the guardrail on the right side of the road.  Myers was able to exit the passenger door, but had to "squeeze" to get out against the guardrail.

{¶7}   Soto and Myers were moving construction barrels from one side of the road to the other, placing them against a cement wall to keep drivers away from the wall at night due to the missing edge lines.  The men had placed 4 or 5 barrels and intended to place a total of 10.  They had to wait for breaks in traffic, pursuant to their training, to move the barrels into place.  They were at the scene for about 30 minutes and traffic was light.  Myers estimated 100-150 cars went by; no one came close to them or appeared to have any issue navigating the construction zone and barrels.

{¶8}   At 4:01 p.m., the truck's tailgate was down.  Myers handed Soto the barrels and as breaks came in traffic, Soto took the barrel across the highway to the other side. At the exact moment of the crash, Myers testified, Soto was standing by the taillight of the truck with a barrel in his left hand.  He was not in the lane of travel.

{¶9} A vehicle struck Soto and the Gerken truck at almost exactly the same time. Myers watched the crash occur from about three feet away. The truck, which had been idling in park, was pushed forward a considerable distance, into the guardrail. The red Ford 500 was ahead of the truck, also against the guardrail.

{¶10} Soto sustained catastrophic injuries and death was instantaneous. The force of the vehicle striking him severed his limbs and his brain stem. His torso went through the windshield of the Ford 500 and came to rest in the front passenger seat. Myers could not at first understand what he witnessed. He walked toward the Ford 500 and observed Soto's legs on highway. Thinking Soto might still be alive, he looked into the car and saw Soto face down in the front seat. Myers testified that appellant "seemed nonchalant for someone who just killed someone." Myers asked appellant if Soto was still alive and appellant responded "his arm is back there, so…." Myers knew there was "no hope" and called 911.

{¶11} Myers drives this section of U.S. Route 24 two to three times per week, still, and is very familiar with it. He testified the paving truck's lights were on, he and Soto wore their neon safety vests, and they worked amongst orange construction barrels. The men and their truck should have been visible to motorists in the eastbound lanes of the highway for the length of two to three football fields.

*The witness: Glenn Levy stops in the aftermath of the crash*

{¶12} Glenn Levy is a truck driver who was eastbound on U.S. Route 24 on August 29, 2018, en route to Toledo. Levy noted the roadway approaching the construction zone was new pavement, and part of the road was unstriped. A dotted white

center line divided the two lanes of travel, but there were no edge lines. Levy noted warning signs about a construction zone ahead.

{¶13} Levy's truck is programmed to travel 62 miles per hour. Levy traveled in the right lane and a red car passed him in the left lane. Levy testified the car was not speeding, although it was traveling faster than his own speed. Levy was about 200 yards behind the red car, which was still in the left lane, when he looked down to change his radio. He heard an impact and looked up in time to see the red car careening off the left side of a construction vehicle parked at the side of the road. A cloud of dust and fluids came up, and the red car slid close to the guardrail about 100 yards in front of the construction vehicle.

{¶14} Levy entered the left lane and slowed down. He observed car parts littering the roadway, and an arm. Levy parked and called 911. At the time he thought the limb must belong to a passenger in the red car. After calling 911, Levy got out of his truck and approached appellant. He asked if appellant was OK, and appellant responded that he was fine. Levy asked, "What about your passenger?" referring to the man face-down in appellant's front passenger seat.[1] Appellant responded, "He's not my passenger." Levy told appellant to take a seat on the guardrail and went to appellant's car to check the pulse of Nathan Soto. Soto had no pulse.

*OSHP Investigation: Crash reconstruction shows late evasive action*

{¶15} Trooper Eiden is a crash reconstruction expert with the OSHP, and reconstructed the crash on August 29, 2018. Two vehicles were involved: a Chevy

---

[1] Soto entered appellant's vehicle through a large hole in the passenger side of the windshield and came to rest face-down on the passenger seat.

Silverado pickup truck (the Gerken vehicle) and a Ford 500 (appellant's vehicle). Both vehicles had Event Data Recorders (EDRs), which Eiden examined during his investigation. The Silverado's EDR indicated the vehicle was stationary and idling prior to the crash. When a catastrophic event happens, the Silverado's EDR is able to capture five seconds prior to the catastrophic event.

{¶16} The Ford 500's EDR captures 20 seconds prior to a catastrophic event. The vehicle was traveling at a speed of 73 to 74 miles per hour.[2] At 2.6 seconds prior to impact, the module revealed the driver "let off the accelerator" and the speed began to decline to about 60 miles per hour. T. 295. At four-tenths of a second prior to impact, the brakes were applied—less than one second.

{¶17} Eiden examined the highway for marks and gouges in the road. In this case, there was no evidence of evasive action taken by appellant prior to the crash; i.e., there was no evidence appellant changed direction or speed until the deceleration at 2.6 second prior to impact, and the brake at .04 seconds prior to impact. The lack of evidence in the roadway was consistent with the findings from the EDR.

{¶18} Eiden also testified about crash investigations and his experience as a trooper generally. The most common traffic violation by an impaired driver is going outside of marked lanes. Eiden testified that at the scene, appellant stated he passed the semi and the crash occurred about 20 seconds later. T. 317. Eiden opined that even if appellant's view of the berm area of the roadway had been obstructed as he passed the semi, his "field of view" would have opened up immediately after passing the semi. Upon cross-examination, Eiden was asked what factors might shorten the period of time in

---

[2] The speed limit at the location is 70 miles per hour.

which a driver takes evasive action to avoid a crash, and while Eiden agreed that although obstructed vision could be a factor, more likely factors were distracted driving or impaired driving.  T. 318.

*OSHP Investigation:  Appellant's statements, field sobriety tests, and vehicle inventory*

{¶19} Trooper William Clay was assigned as the investigating officer of the crash. He arrived at the scene and examined the contents of Soto's wallet to confirm his identity. He found appellant about 20 feet away from his vehicle, the Ford 500.  Appellant acknowledged he was the driver and in response to questions, told Clay he was not injured.  Clay administered Miranda warnings to appellant before asking him about the crash.  Clay found it bizarre that appellant kept asking for his wallet from the front passenger seat of his vehicle because it was evident that there was a deceased body on the front passenger seat of appellant's vehicle.[3]  Clay removed appellant from the scene and placed him in his patrol car for questioning because he wasn't sure "reality had set in" for appellant.  T. 341-342.  Clay testified appellant's manner was unusually aloof and he didn't seem to comprehend that he had killed someone, despite the torso in his passenger seat.  Clay characterized appellant as lethargic.  Upon cross-examination, Clay acknowledged it is common for someone to be in shock after a serious crash, but even allowing for shock, he felt appellant behaved unusually.

{¶20} Appellee's Exhibit 43 is a written statement provided by appellant at the scene.  Clay asked questions and appellant at first wrote his own answers, then Clay

---

[3] Upon cross-examination Clay acknowledged it may have been his cell phone that appellant repeatedly requested.  Either way, Clay found it odd that appellant was focused on retrieving something from the vehicle.

wrote both questions and answers. Appellant wrote, "I was driving in left lane, after passing semi I switched lanes to the right, mostly a blur after that." Appellant said he was not injured; he had scratches on his leg and hand. He was belted and traveling about 65-70 miles per hour. Appellant denied he was distracted by anything, other than moving around a semi. When asked how long he was behind the semi, appellant responded, "I don't know. It was going slow then I tried to pass it. I wouldn't guess I was behind it more than ten seconds." Appellant said he did not see the construction vehicle or the workers; nor did he see the road-construction warning signs. He acknowledged he drove this route almost every day on his way to work at Marco's, which was his destination at the time of the crash. He was coming from home and he got eight hours of sleep the night before. Appellant said he went to bed around 5:00 a.m. and woke up around 1:30 or 2:00 p.m. which was usual for him because he works the late shift. Appellant said, "It takes me a while to wind down," and Clay asked, "What do you do to wind down?" Appellant responded, "Pretty much watch TV."

{¶21} Appellant said he didn't know what lane he struck the pedestrian in; there were no edge lines on the highway. Appellant acknowledged he struck the pedestrian in the shoulder, and Clay asked whether he saw any other vehicles traveling on the shoulder. Appellant said no. Clay asked, "Why did you start driving in the shoulder?" and appellant responded, "My plan was to go to the third lane I just. In the shoulder" (*sic*).[4] Clay asked if appellant was on any type of medication, and appellant responded that he used to take Wellbutrin for depression but stopped about a month ago because he felt it wasn't working. He denied taking any illegal substances.

---

[4] There is no third lane on U.S. Route 24 in the area of the crash.

{¶22} Clay's suspicions were raised by appellant's incomplete statements and strange manner. He drove this route every day, and yet he said he was attempting to enter a nonexistent third lane of the highway. His answers to questions trailed off and were incomplete. It was a bright, clear, sunny day; the workers had neon vests on; the construction vehicle was illuminated; it was difficult to believe that anyone driving by could not have seen the workers and the vehicle.

{¶23} As Clay took appellant's statement, other troopers inventoried his vehicle in preparation to be towed. On the passenger rear floorboard, troopers discovered a purple Crown Royal bag containing a glass smoking pipe, green plant material, and a marijuana cigarette. The marijuana cigarette was burnt at the edges, and the glass pipe contained green material suspected to be marijuana.

{¶24} After finding the items, Clay asked appellant whether his "winding down" included smoking marijuana. Appellant said yes, he regularly smoked marijuana at home. Clay asked how much he smoked the night before, and appellant replied, "A bowl." Appellant said that was a typical amount for him.

{¶25} At this point Clay intended to ask appellant to submit to field sobriety tests. Pursuant to Clay's training, marijuana can impair the body for up to 24 hours. Appellant said he went to bed at 5:00 a.m., and the crash was around 4:00 p.m. Clay is a certified Drug Recognition Examiner (DRE), but he did not conduct a DRE upon appellant because he knew this was a major investigation of a fatal crash and he sought to avoid confirmation bias. Instead, he would ask for a DRE at the OSHP post.

{¶26} Clay did, however, conduct field sobriety tests at the crash scene. The tests were videotaped and played at trial as appellee's Exhibits 4 and 5. Clay testified to

several clues he observed on the field sobriety tests. On the one-leg stand, appellant made an attempt but struggled, and said he had recently completed two days of hard work, which Clay found inconsistent with his earlier statements. On the horizontal gaze nystagmus, appellant swayed back and forth. On the "modified Romberg test," which measures a subject's internal clock as they estimate a time range of 30 seconds, appellant's time assessment was slow. Clay testified this indicated appellant's ability to observe and react was slow. Clay observed eyelid tremors, which he testified were indications of marijuana usage; he also observed leg tremors on the one-leg stand and walk-and-turn tests. Appellant was unable to stand on one foot. Clay testified appellant demonstrated problems with divided-attention skills, factors which indicate impairment.

{¶27} Clay contacted the OSHP post and asked for a DRE to be available. He transported appellant to the post for the DRE and a urine test. Clay also obtained a search warrant for a blood draw, which was performed at St. Luke's Hospital.

*OSHP Investigation: DRE opines appellant impaired by cannabis*

{¶28} Trooper Chuck Grizzard is an OSHP DRE and was called to the post to perform the Drug Recognition Examination upon appellant. Grizzard prepared a report which was entered at trial as appellee's Exhibit 6.

{¶29} Grizzard first encountered appellant in a room at the OSHP post where appellant had his head down and appeared to be asleep. Grizzard introduced himself and immediately noticed appellant's pupils were dilated, his eyes were red, and his face was flushed. Appellant's speech was slow and deliberate; Grizzard described him as "lethargic and disconnected," apparently not comprehending that he struck and killed someone. Appellant told Grizzard he had no medical problems and was not currently

taking any medications, although he used to take Wellbutrin and stopped about a month ago.

{¶30} Grizzard asked appellant to perform a series of field sobriety tests.  On the modified Romberg balance test, appellant swayed, counted out loud instead of to himself, and estimated 30 seconds in 48 actual seconds.  Grizzard also observed eyelid tremors.  On the walk-and-turn test, appellant lost his balance once, stepped briefly off the line, raised his arms, staggered, and was unbalanced when attempting to turn.  Grizzard also observed leg tremors during this test.  During the one-leg stand, appellant also exhibited leg tremors and displayed "an impaired perception of time."  During the finger-to-nose test, he touched his nose with the pad of his finger and kept his eyes open, failing to follow instructions.

{¶31} For "clinical indicators of impairment," Grizzard noted lack of convergence in one eye and appellant's pupils were dilated.  For "signs of ingestion," Grizzard noted appellant's oral area was reddened and his entire oral cavity had a greenish hue.  Appellant's tongue had raised taste buds and there appeared to be pieces of green plant material between his teeth.

{¶32} Appellant made several statements about the crash to Grizzard.  He said he was in the "middle lane" when he came up behind a semi, so he changed lanes to the left lane to pass the semi before he decided to change lanes again.  Grizzard advised the highway was two lanes only, and appellant seemed not to understand.  Appellant said there were no vision obstructions and no vehicles in front of him.  Grizzard asked whether he saw the construction workers' neon vests or the flashing lights on the construction vehicle and he said "no."  Appellant said he was tired and when asked whether he realized

he struck a person he said, "I have no idea what happened." Grizzard testified appellant had no idea the torso of the person he struck was in the passenger seat next to him.

{¶33} Appellant also stated, "I take Xanax but I'm not prescribed it, I just buy it from people." He said he took Xanax "a couple days ago."

{¶34} Grizzard's ultimate opinion as a DRE was that appellant was under the influence of cannabis and unable to operate a motor vehicle safely. Grizzard based his opinion on appellant's "distinct and measureable impairment on field sobriety tests" and appellant's description of "no apparent medical problems, illness, or injury to account for the impairment or negate the exam." The indicators of cannabis noted by Grizzard included lack of convergence, dilated pupils, "altered perception of time and distance," body tremors, bloodshot eyes, debris in mouth, disoriented, drowsiness, impaired memory, and lack of concentration.

{¶35} Grizzard also kept notes of his conversation with appellant. Appellant was asked what drugs or medications he used, and appellant said marijuana every day, Xanax whenever he can buy it, and Percocet whenever he can buy it. When asked how much and when, appellant said he "smoked a bowl" of marijuana between 2:00 a.m. and 5:00 a.m. Xanax use was "maybe yesterday" and Percocet was "taken last week."

{¶36} Upon cross examination Grizzard repeatedly acknowledged that any of these indicators taken in isolation could have many causes. For example, appellant's red, dilated eyes are not only an indication of drug use. While it is possible appellant was crying after the crash, Grizzard did not observe appellant crying.

{¶37} Grizzard testified that nothing he observed during the DRE gave him any indication of Xanax use, other than appellant's own statements that he last used Xanax a day before.  T. 444.

*OSHP Investigation:  Blood and urine results positive for marijuana and Xanax*

{¶38} Forensic toxicologists from the OSHP Crime Lab testified about the results of appellant's blood draw and urine analyses.

{¶39} Appellant's blood sample tested positive for Alprazolam[5] in the amount of 123.23 ng/ml, plus or minus 9.85 ng/ml, and positive for T.H.C. (Marihuana Metabolite) in the amount of 7.30 ng/ml, plus or minus 0.51 ng/ml. The Alprazolam number is so high that the toxicologist had to dilute the sample because it was above the highest calibration point of the instrument used to measure the sample.  The marijuana metabolite result is above the per-se limit for an O.V.I. violation in Ohio.  T. 475.  The toxicologist testified that Ohio does not distinguish between active and inactive metabolites of marijuana in its O.V.I. statutes; the state sets a limit, and appellant was above that limit.

{¶40} Appellant's urine result was positive for Alpha-Hydroxyalprazolam, positive for Alprazolam, and positive for T.H.C. (Marihuana Metabolite) in an amount of 93.14 ng/ml, plus or minus 9.31 ng/ml.  The forensic toxicologist testified that appellant's urine result was above the per se limit for marijuana metabolite.  She further testified there is no such number associated with Alprazolam; a result is only "positive" or "negative."

{¶41} Appellee called a witness from the State Board of Pharmacy to testify to the effects of Alprazolam (Xanax) upon the body; it is a central nervous system depressant and users should not engage in hazardous occupations of activities requiring mental

---

[5] Alprazolam is the drug commonly known by the brand name Xanax.  T. 505-506.

alertness such as operating a motor vehicle. Further, clinical warnings for Alprazolam advise against using it with other central nervous system depressants such as alcohol or marijuana.

*Appellee's expert toxicologist: Dr. Forney opines appellant impaired by Xanax*

{¶42} Dr. Robert Forney was called by appellee as an expert in forensic toxicology and drug analysis. Forney's role was to explain the drug test results.

{¶43} Forney started with the blood sample test results of Alprazolam in the amount of 123.23 ng/ml +/- 9.85 ng/ml and T.H.C. (Marihuana Metabolite) 7.30 ng/ml +/- 0.51 ng/ml.

{¶44} Forney testified that the marijuana metabolite in appellant's blood was inactive and had no effect on cannabinoid receptors in the body. Marijuana metabolite is a product of the breakdown of drugs but was inactive. This was not a surprising result, per Forney, because THC becomes undetectable in the blood in three to five hours. He emphasized that THC is in the brain much longer than it is detectable in the blood. He could not rule out the possibility, therefore, that when a metabolite was detected in the blood, THC affected the person five to seven hours before the blood was drawn.

{¶45} Regarding the Alprazolam results, Forney testified 123.23 ng/ml is a significant amount, an amount which cannot be reconciled with appellant's claim that he last took Xanax two days before the crash. If that was true, the concentration would have been lower. Forney testified that the level detected was so high that if appellant truly had taken the Xanax two days earlier, he would have been close to an overdose to reach the level he was at after the collision.

{¶46} Forney opined appellant was under the influence of Alprazolam at the time the blood was collected. He further opined appellant was impaired in his perception, judgment, reaction, and coordination; he was more likely to take risks and less likely to anticipate a response to changes in circumstances. This impairment could adversely affect appellant's operation of a motor vehicle by making him more likely to drive while intoxicated while lowering his ability to recognize danger and respond appropriately. THC adds to the depressant effect of Alprazolam.

{¶47} Upon cross-examination, Forney acknowledged an inactive marijuana metabolite would have no effect on appellant's driving. Forney stated that if there was active THC in appellant's brain it would increase the amount of impairment; simply because THC was not quantified in the blood does not mean it was not affecting his brain. Forney notes the DRE found influence of cannabis and the explanation for the inactive metabolite could be the length of time between the crash and retrieval of the samples.

*Defense case*

{¶48} Appellant's first witness was a crash reconstructionist who testified that after reviewing the OHSP crash investigation, reconstruction, and findings, he had no issues with investigators' conclusions about how the crash occurred. He opined, however, that the lack of lane markings and the contour of the road were additional factors in the crash.

{¶49} Dr. Robert Belloto, a pharmacist, testified as appellant's expert witness in the areas of pharmacology, toxicology, statistics, and chemistry. Belloto disagreed with Forney's conclusions and opined that the marijuana metabolite was inactive and therefore played no role in the crash and, "crash risk with the use of Alprazolam is not increased," based upon Belloto's reading of a NHTSA report.

*State's Exhibit 48:  Appellant's hospital records are introduced*

{¶50} Upon cross examination, the prosecution drew Belloto's attention to the materials he reviewed in formulating his report.  Item number 8 is "ProMedica Flower Hospital Campus Medical Records (8 pages)."  This item caused confusion because Belloto testified these were medical records of appellant that he reviewed, but the prosecution was unaware of any such records.  Appellant had not been treated after the crash.

{¶51} Outside the presence of the jury, the prosecutors asked defense trial counsel if appellant was hospitalized at ProMedica Flower Hospital, and counsel responded "I don't recall if he was."  T. 727.  A brief recess was taken to determine whether the ProMedica Flower Hospital records could be found.

{¶52} In chambers, the following information was developed.  Eight days prior to the crash, appellant was at Flower Hospital withdrawing due to an addiction to Xanax.  Records generated from that visit state appellant was addicted to Xanax, Percocet, and alcohol.  T. 735.  Defense trial counsel said that based upon information from appellant's family, appellant went to the hospital once, on August 20, 2019, got no relief, and left.  This information was not provided to appellee in discovery and the trial court pointed out it would have been germane to appellee's expert witnesses and their opinions.

{¶53} Defense trial counsel acknowledged he sent the Flower Hospital records to Belloto, but he didn't know he had the records or he would have turned them over if he thought they were discoverable.  T. 738.  Defense trial counsel did argue the records were not relevant to the issue of whether appellant was impaired on the date of the crash.  T. 738, 763.

{¶54} The trial court asked the prosecutors how they wanted to proceed and whether they wanted Forney to be recalled or to review the records. The prosecutors demurred and said they would simply question Belloto about the hospital records.

{¶55} The following conversation was had outside the presence of the jury:

> * * * *.
>
> THE COURT: Back on the record in chambers. [Prosecutor.]
>
> [PROSECUTOR]: Judge, we would intend to admit the report as a medical report for purposes of medical diagnosis, as to enter into the record as it was a material utilized by [Belloto] when he prepared his expert report.
>
> It would be our intent to question him on the report, and it would be our intent to reserve the right to call Dr. Forney for Rebuttal testimony specifically in light of the new piece of evidence that has been provided to the State with respect to [appellant] and his use and treatment—use and overdosing of Xanax.
>
> THE COURT: And have you reached out to Dr. Forney? Do we know he is actually available?
>
> [PROSECUTOR]: He is available, Judge, and again, we can see how the testimony plays out with Dr. Belloto the rest of the day. But he is in the office today and did indicate he will be available in the morning.
>
> THE COURT: All right. [Defense trial counsel.]

[DEFENSE TRIAL COUNSEL]:  Judge, whatever the State wants to do is fine with me.  I want the Court to know it is totally inadvertent.  I didn't realize I had this record or I would have given it to [the prosecutors] before.

I would point out that he was referenced in Dr. Belloto's report as something he apparently reviewed, so had I known that you didn't have it I would have found it.  It was apparently misfiled in my file.

This case, Judge, involves many, many documents, pieces of paper.  I am surprised I even found it, frankly.  It was never my intent not to provide it.  Had I known I had it I certainly would have provided it.

Again, I don't know if it's going to materially change anything.

[PROSECUTOR]:  I would think that if he's—there's a statement by [appellant] eight days prior that he pops seven benzos, which is what Alprazolam and Xanax is, that he is struggling with withdraw symptoms from that medication.  I would think that would be fairly material in this case where there is an expert testifying that there is no impairment as a result of the toxicology.

[DEFENSE TRIAL COUNSEL]:  Well, eight days later, nine days later.

[PROSECUTOR]:  Right.

[DEFENSE TRIAL COUNSEL]:  That's the difference.  Whatever you guys want to do is fine.

THE COURT: Well, the scenario is not one that I find overly credible, the explanation. It would be one of those situations where—and I think these were your words before, [defense trial counsel], something to this effect, the nature of this magnitude—a case the nature of this magnitude the case represents would also dictate that you know everything about the case including the documents that you sent to your expert to have that opinion rendered based on these 28 items that are listed in the report as part of the basis for the expert's opinion.

The fact that these documents were turned over to your expert but not to the State, and in a way that you've explained is less than compelling.

The State will be allowed to cross examine the witness. The State will also be able to move for admission of the document. I believe what I've heard you ask for is fine so I'm assuming that means that's without objection that the document is going to be received. If there is going to be an objection we're going to hear it in here in hear it now, [defense trial counsel].

[DEFENSE TRIAL COUNSEL]: Your Honor, the only objection I would post is to the relevance of the document. It is nine days before this incident of driving and the collision. I don't see the relevance of it.

[PROSECUTOR]:  It's relevant in that the Defense expert himself utilized the document in generating his expert report and actually lists that as something he would have reviewed despite the fact that he did not mention any of the factors from the report in his findings or criticism of Dr. Forney.

[DEFENSE TRIAL COUNSEL]:  His report concentrated on the impairment, if any, of appellant on August 29, 2018 which is what Dr. Forney concentrated on as I read his report.

THE COURT:  [Prosecutor], you had read a line out of the report, something to the effect of at some point with struggling with the addiction when not taking it and then all of a sudden going back to taking it takes several at a time, or something to that effect.  What was that?

[PROSECUTOR]:  He states he has had withdraws (*sic*) from Percocet before but does not feel that is an issue.  He states he will go days without using Benzos and then pop, in quotes, seven at a time.

[DEFENSE TRIAL COUNSEL]:  Not Xanax.

[PROSECUTOR]:  Benzos would be Xanax.

THE COURT:  So that sounds like information that if it was provided to an expert witness may or may not have some sort of an impact, that being not turned over to the State and the State's witnesses and/or experts having the opportunity to review that, I think

there's grounds for some leeway in allowing the State to the conduct Cross Examination of this witness utilizing this report (*sic* throughout).

I do find that it is relevant, and that the document, if requested during the examination, in all likelihood will be received.  * * * *.

* * * *.

T. 741-746.

{¶56} Back in the presence of the jury, appellee's Exhibit 48 was marked for evidence and the prosecutor used the document to cross-examine Belloto.

{¶57} Appellee's Exhibit 48 is an 8-page document from ProMedica Flower Hospital Campus ED dated 8/20/18 in the name of appellant and states in pertinent part:

Chief complaint: Patient presents with withdrawal-drugs. Wants detox from Xanax, gets them off the street.  Patient presents to ER requesting withdrawal.  Pt was previously addicted to Xanax, percocets, and ETOH.  He was going to Racing for Recovery but is now going through a withdrawal.  Pts mother was the one who recommended for him to come in.  Pt does not usually get terrible withdrawals from EtOH and Xanax, but gets cravings for percocets."

1.

Discharge planning note:  SW met with pt who came to Flower due to withdrawal from Xanax.  Pt states he went to Racing for Recovery for one meeting so far and they told him to get detox.  SW informed pt we do not offer detox here at Flower.  Pt is not suicidal

or homicidal.   Pt does not have health insurance but states he resides in Lucas county.  He states he goes for days not using but uses Xanax, Percocet, and alcohol at times.  He states he has had withdrawals from Percocet before but does not feel that is an issue not (*sic*).  He states he will go days without using benzos and then "pop" seven at a time.  * * * *.

{¶58} Belloto acknowledged "seven Benzos at a time" is not a therapeutic dose. T. 749, 760.  Appellee moved to admit Exhibit 48, appellant objected as to relevance, and the trial court reserved ruling on admission.

{¶59} At the conclusion of the day's evidence, the parties outlined their positions regarding Exhibit 48.  The trial court admitted the exhibit into evidence as a statement for purpose of medical diagnosis or treatment pursuant to Evid.R. 803.4 and as a document used to create an expert opinion.  T. 790.

*Indictment, trial, conviction, and sentence*

{¶60} Appellant was charged by indictment with one count of aggravated vehicular homicide pursuant to R.C. 2903.06(A)(1)(a) and (B), a felony of the second degree, and one count of aggravated vehicular homicide pursuant to R.C. 2903.06(A)(2)(a) and (B), a felony of the third degree.  Appellant entered pleas of not guilty.

{¶61} The matter proceeded to trial by jury.  Appellant moved for judgment of acquittal pursuant to Crim.R. 29(A) at the close of appellee's evidence and at the close of all of the evidence.  The motions were overruled.  Appellant was found guilty as charged upon Count I, aggravated vehicular homicide pursuant to R.C. 2903.06(A)(1)(a) and (B),

a felony of the second degree.  Appellant was found guilty of the lesser offense of vehicular homicide pursuant to R.C. 2903.06(A)(3)(a) and (C) upon Count II.  The trial court found the offenses merged for purposes of sentencing and appellee elected to sentence upon Count I.  The trial court thereupon imposed a prison term of 7 years.

{¶62} Appellant now appeals from the trial court's judgment entry of conviction and sentence.

{¶63} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶64} "I.  THE TRIAL COURT PLAINLY ERRED IN LETTING THIS CASE GO TO THE JURY ON A FLAWED THEORY OF PROXIMATE CAUSATION RESPECTING THE PRESENCE OF INACTIVE METABOLITES IN MASSUCCI'S SYSTEM."

{¶65} "II.    THE CONVICTION UNDER COUNT ONE CANNOT STAND BECAUSE DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY, INTER ALIA, FAILING TO TIMELY SEEK SUPPRESSION OF OBJECTIONABLE EVIDENCE, FAILING TO PROPERLY ARGUE THIS COURT'S DECISION IN *STATE V. MOORE,* 6TH DIST. NO. WD-18030, 2019-OHIO-3705, AND DISCLOSING HIS CLIENT'S PRIVILEGED MEDICAL RECORDS THAT THE PROSECUTOR THEN TOUTED AS LYNCHPIN EVIDENCE OF GUILT."

**ANALYSIS**

I.

{¶66} In his first assignment of error, appellant argues his conviction for aggravated vehicular homicide is not support by the evidence on a number of bases.  Essentially his argument is that the presence of inactive marijuana metabolites cannot

support a violation of R.C. 4511.19(A)(1)(j) which is sufficient to establish a predicate offense for an aggravated-vehicular-homicide conviction.  We disagree.

{¶67} Appellant's first assignment of error addresses his conviction upon Count I, aggravated vehicular homicide pursuant to R.C. 2903.06(A)(1)(a), which states in pertinent part, "No person, while operating or participating in the operation of a motor vehicle, * * * shall cause the death of another * * * [a]s the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance[.]"

{¶68} In the instant case, the jury was instructed that five elements must be proven beyond a reasonable doubt before appellant could be found guilty of aggravated vehicular homicide, to wit: That appellant, 1) while operating a motor vehicle 2) did cause 3) the death of another, to wit: Nathan Soto, 4) as a proximate result of committing a violation of Revised Code 4511.19, to wit: a) operating with a prohibited drug concentration while under the influence of a drug of abuse, to wit, Alprazolam; or b) operating with a prohibited drug concentration; or c) operating under the influence of drugs of abuse; and 5) venue.  T. 845-846.

{¶69} We perceive the premise of appellant's argument to be that proximate causation for an aggravated-vehicular-homicide offense is not supported if the predicate offense is an O.V.I. inactive-metabolite offense.  Appellant cites *State v. Moore*, 6th Dist. Wood No. WD-18-030, 2019-Ohio-3705, for the premise that proof of inactive metabolites are immaterial to the proximate-cause element of R.C. 2903.06(A)(1)(a).  Appellant has selectively cited portions of *Moore*, and we disagree that the decision supports his argument.  *Moore* is instructive in the instant case, though, because it is distinguishable.

{¶70} The evidence in *Moore* established that the defendant was driving a vehicle accompanied by her boyfriend as a front-seat passenger. *Id.* at ¶ 3. The vehicle struck a tree, a witness called 911, and police found the defendant near the scene of the crash asking, "Is he dead?" and "Who was driving?" Officers found the vehicle with the boyfriend, deceased, in the driver's seat. *Id.* The defendant was charged with, e.g., aggravated vehicular homicide pursuant to R.C. 2903.06(A)(1)(a), with the O.V.I. offense being a violation of operating a vehicle under the influence of a listed controlled substance or a listed metabolite pursuant to R.C. 4511.19(A)(1)(j)(ii). A blood test found a metabolite of cocaine in the defendant's blood, which Dr. Forney testified was inactive. *Id.* at ¶ 18. The defendant argued "[a]ll of the homicide charges against [her] require the State to prove that some sort of culpable conduct, or the mens rea of recklessness[,] was the proximate cause of the death," but the state did not present sufficient evidence, or any evidence, as to what caused the accident; there was no testimony that she was under the influence of anything at the time of the accident which would impair her ability to operate a vehicle. *Id.* The state responded that R.C. 4511.19(A)(1)(a) is a strict liability statute and therefore the state only had to prove that appellant was under the influence while operating a vehicle; furthermore, because appellant's OVI conviction is a strict liability offense, her conviction for aggravated vehicular homicide, which is predicated on her violation of R.C. 4511.19(A)(1), is a strict liability offense as well.

{¶71} The Court concluded that the state could not prove the defendant caused the victim's death as a proximate result of driving with a prohibited concentration of cocaine in her blood in the absence of evidence regarding the potential effects that a prohibited concentration of cocaine would have on a driver:

Here, [defendant] notes R.C. 4511.19 provides for a per se violation, and argues "it is possible for a per se violation of R.C. 4511.19 to constitute the predicate offense for a violation [of] R.C. 2903.06 and or R.C. 2903.04, the State must still prove that the predicate offense was the proximate cause of the accident." [Defendant] contends the predicate offense is based on a per se violation involving cocaine metabolite, which the state's expert, Dr. Forney, acknowledged was inactive. [Defendant] asserts the state did not ask Dr. Forney whether or not anything in her blood would have affected her ability to operate a vehicle.

Since [defendant] challenges the proximate cause or result element of the offense of aggravated vehicular homicide, we will limit our analysis accordingly.

In *State v. Filchock*, 166 Ohio App.3d 611, 2006-Ohio-2242, 852 N.E.2d 759 (11th Dist.), Filchock argued the evidence was not sufficient to sustain the conviction of aggravated vehicular homicide because the victim's death "was not caused by * * * impaired driving, but from some other cause." *Id.* at ¶ 76. The appellate court held "'the definition of "cause" in criminal cases is identical to the definition of "proximate cause" in civil cases * * * [and] [t]he general rule is that a defendant's conduct is the proximate cause of * * * death to another if the defendant's conduct is a "substantial factor" in bringing about the harm.' " (Citation omitted.) *Id.* at ¶ 77. The court noted that the

trial testimony revealed there could have been several causes of the victim's death, including Filchock operating a motor vehicle under the influence of alcohol; Filchock's reckless or negligent operation of a motor vehicle; the victim's slow speed; or Filchock's "monkey business" with another vehicle. *Id.* at ¶ 56.

The court observed "the question for the jury was whether there was evidence beyond a reasonable doubt that Filchock's act of [operating] of a motor vehicle under the influence of alcohol was the direct cause of [the victim's] death, and without which [the death] would not have happened." *Id.* at ¶ 56. The court noted the evidence revealed Filchock "was observed to be swerving in and out of traffic, * * * was driving at a high rate of speed, * * * fled the scene without calling the police, * * * had a strong odor of alcohol on his person, * * * had bloodshot eyes * * * refused field-sobriety tests, and * * * [had a] blood-alcohol content * * * above the legal limit." *Id.* at ¶ 80. The court found the evidence, when viewed in the light most favorable to the prosecution, showed that "reasonable minds could conclude beyond a reasonable doubt that Filchock's operation of his motor vehicle under the influence of alcohol was the cause of [the victim's] death." *Id.* at ¶ 81. See also *State v. Lennox*, 11th Dist. Lake No. 2010-L-104, 2011-Ohio-5103.

Here, a review of the record shows there is no evidence that [defendant's] act of driving with a prohibited concentration of cocaine

in her blood was the direct cause of [her boyfriend's] death, and without which, his death would not have occurred. The state furnished no evidence regarding the potential effects that a prohibited concentration of cocaine in a person's blood would have on a person, or on a person's ability to operate a vehicle. Without such evidence, the state failed to prove that as the proximate result of [defendant] driving with a prohibited concentration of cocaine in her blood, [defendant] caused [her boyfriend's] death. As such, there was insufficient evidence to prove each element of the crime of aggravated vehicular homicide. * * * *.

*State v. Moore*, 6th Dist. Wood No. WD-18-030, 2019-Ohio-3705, ¶ 22-27.

{¶72} Thus, in *Moore* the Sixth District does not rule out a conviction for aggravated vehicular homicide in which the predicate offense is a per se violation involving metabolite evidence; instead, it provides a road map for the type of evidence required by such a case. *Moore* is distinguishable from the instant case for a number of reasons. First, as appellee points out, only one of the predicate offenses upon which Count I rests is wholly dependent upon a per se violation of the marijuana-metabolite limitation.

{¶73} Moreover, the instant case is replete with evidence supporting impairment and causation. As to impairment, appellee presented evidence that appellant had marijuana and paraphernalia in the vehicle; the OSHP investigation concluded that appellant was impaired by marijuana at the time of the crash due to observations by Clay

and the DRE, including appellant's performance on field sobriety tests, a greenish cast to his oral cavity, and plant matter between his teeth; and the blood draw and urine test results were admitted into evidence.

{¶74} As to causation, appellant presented indicators of impairment on divided-attention skills tests; told officers he never saw the warning signs, construction vehicles, or the workers; and the law enforcement witnesses testified marked-lanes violations are most common among impaired drivers. The crash reconstruction appellant braked less than a second before impact, and the lack of evasive action is often explained by distraction or impairment. The urine and blood samples were taken about five hours after the crash; Forney explained that although THC might not be detectable in the blood after this amount of time, it can still affect the brain.

{¶75} Our review of the record of the instant case thus demonstrates a plethora of evidence that appellant's act of driving with a prohibited concentration of marijuana metabolite in his blood was the direct cause of Soto's death, and without which, his death would not have occurred. Appellee offered evidence of the potential effects that a prohibited concentration of marijuana metabolite in a person's blood would have on a person, or on a person's ability to operate a vehicle. See, *Moore*, supra at ¶ 27.

{¶76} Appellant further argues the trial court erred in its jury instructions on proximate cause, but doesn't point to an error in the instructions and instead points to alleged flaws in the prosecutor's closing argument. We note we find no error in the trial court's instructions on proximate cause and in light of our ruling upon appellant's second assignment of error, infra, we need not reach the merits of appellant's argument as to elements of the prosecutor's closing argument.

{¶77} Appellant's first assignment of error is overruled.

II.

{¶78} In his second assignment of error, appellant argues he received ineffective assistance of trial counsel. We agree to the extent that counsel erred in overlooking disclosure of privileged medical records resulting in the reasonable probability the result of the proceeding would have been different but for the disclosure.

{¶79} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See, Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158 (1955). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶80} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. Appellant must show counsel's errors were so serious as to deprive him of a fair trial, "a trial whose result is reliable." *Id.* at 687.

Appellant would meet this standard with a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶81} In the instant case, appellant asserts he received ineffective assistance on several grounds. We first address appellant's final argument, that he received ineffective assistance of defense trial counsel because his privileged medical records were disclosed. Upon our review of the trial record, disclosure of appellant's medical records from 9 days prior to the crash was effectively a bombshell due to appellant's statement that he "will go days without using benzos and then 'pop' seven at a time." We will refer to the records of the August 20, 2018 visit as appellee's Exhibit 48.

{¶82} The existence of these records arose at the beginning of cross-examination of Belloto, when the prosecutor noted Belloto cited "medical records" in his report as one of 28 items he reviewed, apparently for the first time. Upon being asked if and when appellant was treated at ProMedica Flower Hospital, defense trial counsel "didn't recall" and had to consult appellant to determine the source of the records. From Exhibit 48 itself, we discern the records were generated when appellant went to the hospital seeking relief for withdrawal symptoms nine days prior to the crash. During this visit, appellant admitted to addictions to Xanax, Percocet, and alcohol, and that he abuses these substances; he sought a detox program which was not offered by ProMedica Flower Hospital.

{¶83} It is not apparent how Exhibit 48 is not subject to the medical privilege contained in R.C. 2317.02(B)(1).[6]  Appellee responds that the privilege does not apply "[i]n any criminal action concerning any test or the results of any test that determines the presence or concentration of alcohol, a drug of abuse, a combination of them, a controlled substance, or a metabolite of a controlled substance in the patient's whole blood, blood serum or plasma, breath, urine, or other bodily substance at any time relevant to the criminal offense in question."  R.C. 2317.02(B)(1)(c).  It is not apparent that there was any such testing during the visit on August 20, 2018, which would allow application of the exception, or would allow for a law enforcement officer to seek such records relevant to a criminal investigation pursuant to R.C. 2317.02(B)(2).

{¶84} Although the ultimate admissibility of Exhibit 48 is outside the scope of this opinion, we speculate on its admissibility because defense trial counsel did not raise the argument of privilege or assert any argument preventing the exhibit's admission other than relevance.  While the records are certainly relevant on many levels, it is important to note they are not necessarily admissible.  Counsel's oversight which led to these questions being addressed on the fly, at trial, upon cross-examination of appellant's expert, removed the possibility of arguing the admissibility in a thoughtful, considered way.  The paramount question of the admissibility of Exhibit 48 became conflated with

---

[6] R.C. 2317.02(B)(1) states in pertinent part, "The following persons shall not testify in certain respects: [a] physician, advanced practice registered nurse, or dentist concerning a communication made to the physician, advanced practice registered nurse, or dentist by a patient in that relation or the advice of a physician, advanced practice registered nurse, or dentist given to a patient, except as otherwise provided in this division, division (B)(2), and division (B)(3) of this section, and except that, if the patient is deemed by section 2151.421 of the Revised Code to have waived any testimonial privilege under this division, the physician or advanced practice registered nurse may be compelled to testify on the same subject."

hearsay exceptions, discovery violations, and rules of evidence regarding experts, to the exclusion of any discussion of privilege.

{¶85} Part of the mid-trial discussion involved whether Exhibit 48 was discoverable pursuant to Crim.R.16. A criminal defendant does have a reciprocal obligation to provide discovery including laboratory and hospital reports, but as appellee concedes, "nothing in this rule shall be construed to require the defendant to disclose information that would tend to incriminate that defendant." Crim.R. 16(H). Moreover, materials that are subject to privilege are not subject to disclosure pursuant to Crim.R. 16(J).

{¶86} Part of the basis for the trial court's admission of Exhibit 48 was Belloto's purported reliance upon the records in formulating his expert opinion. Again, although trial counsel did not argue this point, reliance upon Evid.R. 703 is not a guarantee that the records would be admissible. Pursuant to Evid.R. 703, facts or data upon which an expert bases an opinion must be those perceived by him or admitted in evidence at the hearing. In *State v. Solomon*, 59 Ohio St.3d 124, 126, 570 N.E.2d 1118 (1991), the Ohio Supreme Court noted:

> Where an expert bases his opinion, in whole or in major part,
> on facts or data perceived by him, the requirement of Evid.R. 703
> has been satisfied. It is important to note that Evid.R. 703 is written
> in the disjunctive. Opinions may be based on perceptions *or* facts or
> data admitted in evidence. (Emphasis in original).

{¶87} It is not evident from the record the extent to which Belloto relied upon the records of August 20, 2018. Had the records not been overlooked, defense trial counsel

could and should have raised with the trial court the extent to which appellant's hospital records were admissible in the context of Evid.R. 703.

{¶88} In short, it is not evident to us that appellee's Exhibit 48 was properly admitted into evidence. What is evident from the record is defense trial counsel's flustered reaction to appellee's questions regarding the origin of the hospital records cited in Belloto's report. The oversight by defense trial counsel (and appellee) opened the door to haphazard admission of the records. Defense trial counsel argued the records weren't relevant, but never raised the possibility of privilege or explored any other avenues preventing their admission. It is beyond the scope of our review to determine the records' admissibility at retrial, but we note that any of these arguments could have resulted in, at least, admission of the records for a limited purpose. Instead, Exhibit 48 was freely admitted and appellee used it as a cudgel throughout the rest of the trial.

{¶89} Turning then to the issue of a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, we are compelled to find admission of Exhibit 48 undermines our confidence in the outcome of the trial. In our examination of the second prong of the *Strickland* analysis, we agree with appellant's characterization that the prosecutor touted appellant's statements contained in Exhibit 48 as "linchpin evidence of guilt." The linchpin of an argument is the piece holding myriad strands of the argument together, and the vision of appellant "popping seven benzos at a time" became appellee's linchpin in arguing appellant was impaired at the time of the crash.

{¶90} Prior to admission of Exhibit 48, appellee was attempting to tie up several threads: the OSHP investigation including the DRE found marijuana impairment;

appellee's expert testified the marijuana metabolite was inactive but appellant had a "significant" amount of Alprazolam in his blood belying his statement that he last took Xanax two days before the crash. If that were true, Forney opined, appellant would have been potentially in an overdose situation, a possibility seen in new light upon admission of Exhibit 48.

{¶91} No evidence exists that on the day of the crash, or at any time relevant to the crash, appellant "popped 7 Benzos" and drove his car. Our review of the record, however, indicates that upon admission of Exhibit 48, appellee heavily relied upon the statement. Appellee repeatedly referenced appellant's purported "popping of seven Benzos" throughout cross-examination of Belloto. T. 748-749, 752, 754, 758, 760. In response to appellant's Crim.R. 29(A) motion at the close of all of the evidence, appellee argued it was inherently reckless to be on the road * * * "after possibly popping seven Benzos." T. 784. Appellee relied upon Exhibit 48 throughout closing argument, arguing it was "not a coincidence" that a person who was advised to go to detox nine days earlier and sometimes popped several Benzos at a time caused this crash. T. 796. Appellee blamed the crash on the fact that appellant was not admitted to a detox facility. Id.

{¶92} And with respect to appellant's impairment at the time of the crash, appellee used Exhibit 48 as linchpin evidence of appellant's guilt as follows:

> So I ask you this, when someone gives two different answers with respect to marijuana use, when someone gives three different answers with respect to Xanax use, which one should you believe? * * * *.

Let's let the toxicology answer that question. Over the legal limit for marijuana metabolite and blood and urine and an amount of Alprazolam described by Dr. Forney as a pretty big number even in the context of people showing impaired numbers, his is high in that category, Ladies and Gentlemen. A quantity so high that the lab had to dilute the sample before they could complete their testing outside of their normal range that allows for testing.

All of these numbers described by Dr. Forney and the blood and the analyst are consistent with one statement by the Defendant; not the statements after the crash, not the statements as he's being questioned about his impairment, not the statements to law enforcement. They are consistent with one statement in State's Exhibit 48, and you can confer to that and that statement is: I go days without taking the medication and then I pop 7 at a time.

That's how you get a really big number as Dr. Forney described it. That's how you get off the charts outside of the testable range for the Ohio Columbus Crime Lab, Ladies and Gentlemen. That is the relevant statement that we have from the Defendant and it was made nine days earlier.

So science tells us he's impaired and common sense

tells us he's impaired, Ladies and Gentlemen. * * * *.

T. 799-800.

{¶93} Additional references to appellant popping 7 Benzos or Xanax at a time and failing to get into detox are found in closing argument at pages 803 and 807, and in rebuttal at page 826 and 829.

{¶94} We conclude that the ineffective assistance as to overlooking the August 20 hospital records, leading to unlimited admission of those records, in conjunction with counsel's failure to raise the issue of privilege, combine to create such prejudice to appellant as to require reversal of the convictions and remand for new trial.

**CONCLUSION**

{¶95} Appellant's first assignment of error is overruled. Appellant's second assignment of error is sustained and the judgment of the Lucas County Court of Common Pleas is reversed. This matter is remanded for further proceedings consistent with this opinion.

By: Delaney, J.,

Hoffman, P.J. and

Wise, Earle, J., concur.

Sitting by Assignment by the
Ohio Supreme Court

_____
HON. PATRICIA A. DELANEY

_____
HON. WILLIAM B. HOFFMAN

_____
HON. EARLE E. WISE, JR.